Raylon YOUNG, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–9701–CR–15.

Supreme Court of Indiana.

Aug. 19, 1998.

Patricia Caress McMath, Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Preston W. Black, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

A jury convicted Raylon Young for the murder[1] of Korey Roney. The trial court sentenced Young to sixty-five years in prison. Young contends that the trial court erred in refusing to instruct the jury on reckless homicide and involuntary manslaughter. We agree it was error to refuse the tendered instruction on reckless homicide. Accordingly, we reverse and remand for a new trial.

## Facts

On the night of November 19, 1995, the victim, Korey Roney, and several friends, about nine people in total, were wrestling in the front yard of Tijuan Johnson's home at 3142 North Orchard in Indianapolis. By around 8 p.m., the others had stopped in order to watch the continuing contest between Korey and Marvin Graves which was taking place near the house, just south of the front porch. Though it was dark, the small, treeless front yard was illuminated by the home's porch light, by the neighbor's lights, and by the street light to the south of the house. Tijuan Johnson estimated the distance from his front porch to the road at about twenty feet.

As the spectators cheered Korey and Marvin, a blue 1979 Oldsmobile Ninety-eight with a white top moving south on North Orchard pulled up north of the home's driveway and stopped abruptly between two cars parked on the street such that the Oldsmobile's passenger side faced the front of the house. All five eyewitnesses who testified said that it was Raylon Young they saw in the passenger side of the car. Young was "hanging out the window with a gun" and yelled three times to

the crowd gathered outside: "What's up now, punk m____ f____?" or some variation thereof. (Id.) Raylon told the driver to "pull off", raised a handgun in his right hand and fired twice. The car then went north up the avenue.

When asked to describe the apparent target of this first series of shots, the witnesses gave various answers. Willie Pargo responded to the prosecutor's question, "Did he shoot towards the group of people or away from them?" by answering, "Like I guess towards." (R. at 189–90.) Pargo later added "[I] don't know who he was shooting at." (R. at 215.) Danille Hampton, who was approximately seven feet away from Raylon when he fired the first two shots, responded "No" when Young's lawyer asked whether she knew if Raylon was shooting at a specific person or whether she knew if he was shooting "in the ground, at the sky, [or] just wild shooting?" (R. at 222, 230.) Glen Underwood testified the gun was aimed "[a]t all of us .... in the direction by the front porch and around that whole area." (R. at 247.) Damon Brookins said he saw only the first shot, but with regard to that shot; "He [Raylon] was just shootin'. I don't know if he had a main target, I don't know what, you know, I'm just seein' the gun, boom, dude was pullin' off you know." (R. at 269.)

The physical responses of the crowd to the shots differed according to where each individual stood. Brookins and Pargo were standing on the front porch when the Oldsmobile pulled up. Pargo recognized Raylon and said: "that's Raylon. Open up the door." (R. at 262.) Brookins scrambled into the house when he saw the pistol and heard Raylon say "pull off" to the driver. (R. at 263.) The others standing in the front yard dropped to the ground. Everyone except Korey got up after the car pulled away. Korey had been hit in the back of the head and was bleeding.

The Oldsmobile turned around after moving down the street a short ways and came "flyin' right back". (R. at 247.) When the others realized that the car was returning they left Korey on the ground and ran in-

1. Ind.Code Ann. § 35–42–1–1 (West Supp.1997).

doors. Raylon was seated on the edge of the passenger-side door with his arms extended over the car. He fired about four more shots as the car passed. The Oldsmobile continued north up Orchard until it reached 33rd, and then turned left towards Arsenal Street.

Korey lay prone on the ground. The others called the police who arrived about two minutes later. The coroner reported at 8 a.m. the next morning that Korey Roney was dead and that the cause of his death was a gunshot wound to the head.

A subsequent police investigation provided additional details. Several bullet holes and a spent bullet were discovered at 3138 North Orchard Avenue, the house immediately south of 3142 North Orchard. This neighbor reported that her house had been "shot up" at the same time as the shooting described above took place. (R. at 428.) Police discovered another possible spent bullet where bloody towels which Korey's friends had used to cover Korey's wound were found, i.e., near the bushes where Korey was before the shooting began. James Myer, a crime scene specialist from the Indianapolis Marion County Forensic Services Agency, was unable to say whether the bullets recovered were fired in random fashion or specifically aimed by the shooter.

### I. Instructions on Lesser Included Offenses

Patricia Caress McMath has filed an excellent brief on Young's behalf, arguing among other things that the trial court wrongly refused instructions on lesser included offenses. The analysis set forth in *Wright v. State*, 658 N.E.2d 563 (Ind.1995), determines whether a court should accept a party's instructions on lesser included offenses. Under this test the court must first decide whether the lesser included offense is either inherently or factually included within the crime charged by the prosecutor's information. *Id.* If the lesser offense is inherently or factually included, the trial judge must consider whether the evidence provided by both parties creates a serious evidentiary dispute about the element or elements which

distinguish the greater from the lesser offense. *Id.* The failure of a trial court to accept and give a properly tendered instruction when a serious evidentiary dispute exists is reversible error if a jury could conclude that the lesser offense was committed but not the greater. *Id.*

The first two steps of the *Wright* test involve matters of law and an appellant need only demonstrate error to prevail on appeal. When an instruction is refused on grounds that a serious evidentiary dispute does not exist, we reverse only when there is an abuse of discretion. *See Champlain v. State*, 681 N.E.2d 696, 700 (Ind.1997). Where it is not apparent that the instruction was refused on that basis, we review the trial court's decision de novo. *Id.*

### II. Young's Reckless Homicide Instruction

Reckless homicide[2] is an inherently included lesser offense of murder and thus the first part of the *Wright* test is satisfied. *Wright*, 658 N.E.2d at 567. The only difference between the two crimes is the mens rea the State must show to obtain a conviction. *Compare* Ind.Code Ann. § 35–42–1–1 (West Supp.1997) *with* Ind.Code Ann § 35–42–1–5 (West 1986). The issue in Young's case is thus whether there is a serious evidentiary dispute about whether Young knowingly or recklessly killed Roney when he fired the first shots from the Oldsmobile.[3]

A person engages in conduct knowingly if, when he engages in the conduct, he is aware of a high probability that he is doing so. Ind.Code Ann. § 35–41–2–2(b) (West 1986). One engages in conduct recklessly if he or she engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct. Ind.Code Ann. § 35–41–2–2(c) (West 1986).

The trial court did not make findings regarding whether a serious evidentiary dis-

---

2. Ind.Code Ann. § 35–42–1–5 (West 1986).

3. We do not consider whether Young "intentionally" killed Roney since the information alleged only that Young "knowingly" killed. (R. at 21.)

pute existed on the issue of Young's mens rea. Instead, the judge simply stated to the defense counsel that Young was not entitled to lesser included instructions because he had raised an alibi defense.[4] (R. at 516.) Presenting an alibi defense does not automatically bar instructions on a lesser included offense. See, e.g., Shelby v. State, 258 Ind. 439, 440, 281 N.E.2d 885, 886 (1972) (defendant was charged with robbery and presented an alibi defense but was convicted of theft, a lesser included offense of robbery). On the other hand, it may, be somewhat pertinent in making the central inquiry which remains whether there is a serious evidentiary dispute in regard to the element or elements differentiating the greater offense from the lesser. Wright, 658 N.E.2d at 567.[5]

The evidence about Young's state of mind at the time he fired the shot that killed Korey Roney is both conflicting and obscure. Several witnesses acknowledged that they knew Raylon from the neighborhood and there had been no problems between Raylon and those who were in the front yard that night, some even stated that Raylon was a friend. (R. at 214–15, 230–31, 250, 269, 288, 242.) Willie Pargo and Glen Underwood testified that Raylon had no reason to be upset with Korey, and that Raylon and Korey had engaged in friendly conversation just a month and a half before the shooting. (R. at 214, 243–44.) Raylon's harsh words, "what's up now, punk m____ f____?", however, could indicate to a jury that Raylon desired to do more than simply scare those on the front lawn. Eyewitness testimony, indeed the testimony of those who were in the line of fire, disputes this inference however. No

witness stated that he thought Raylon was actually aiming his gun at any specific person. Danille Hampton, only seven feet away from Raylon at the time of the first shots, could not determine whether Young was shooting at anyone in particular or just engaged in wild shooting. Damon Brookins testified; "he was just shootin' . . . dude was pullin' off, you know." (R. at 269.) Though shooting in the direction of numerous people only twenty feet away is obviously "reckless" behavior no matter whether one is in a set or moving position, whether Raylon's acts are sufficient to show he was aware of a high probability that his act would kill is less certain.

While it is Raylon's mental state when he fired the shot which actually killed Korey that would determine whether he committed murder or reckless homicide, a jury might glean inferences from the larger pattern of shots fired to determine this specific mens rea. Of the estimated six shots fired, one bullet hit Korey in the back of the head and was discovered on the ground near where Korey lay after being hit, another was discovered rather far away in a wall of the home next door. (R. at 367–68.) These neighbors described their home as being "shot up" at the same time the above events occurred. (R. at 428.) A crime scene specialist was unable to say whether the recovered bullets were fired at random targets or specifically aimed. Also possibly relevant is the fact that Raylon returned and fired four more shots though all except Korey were inside the home. Korey was prone on the ground during this time but was not shot again.

---

4. Eighteen-year-old Franklin Maxey, whose sister had a baby with Young, testified that Young had been with him in his sister's house at the time of the shooting. R. at 503–05. He said Young was "like a brother" to him. R. at 509. At his sentencing hearing, Young testified about his efforts to make up alibis and admitted he was present at the shooting. R. at 548–49.

5. Whether a defendant raises an affirmative defense bears only tangentially on the issue of whether there is a serious evidentiary dispute regarding the State's case in chief. In Champlain, the trial judge reasoned that the defendant was not entitled to an instruction on reckless homicide since the defendant had argued that another person had committed the murder. On

review, we held that the trial court's statement that such a defense was inconsistent with defendant's alternative defense, which conceded Champlain's involvement but attempted to show a lower level of mental culpability, was inadequate to explain that no serious evidentiary dispute existed regarding whether Champlain had committed murder or reckless homicide. Specifically, we said: "Assuming without deciding that it is within the trial court's discretion to refuse to instruct on affirmative defenses if they are inconsistent with the defense's contentions, the issue in this case is whether an instruction is required when there is a serious evidentiary dispute as to an element of the State's case in chief." Champlain, 681 N.E.2d at 700.

A jury considering these facts could well have found Raylon was acting recklessly but not knowingly when he fired the shot that killed Korey. Firing a handgun towards a group of people only twenty feet away is certainly an act committed in "plain, conscious, and unjustifiable disregard" of the harm that might result, and a "substantial deviation from acceptable standards of conduct," Ind.Code Ann. § 35–41–2–2(c) (West 1986), but given the specific facts of this case, a jury might reasonably decide that such behavior did not reflect a knowing killing.

It is the jury's prerogative to decide such questions of fact. We conclude that the evidence before this jury represented a genuinely disputed matter and that it was error to refuse the instruction. Young is entitled to a new trial. *Wright*, 658 N.E.2d at 567.

### III. Young's Involuntary Manslaughter Instruction

Young also asserts the trial court erred in refusing to accept his instruction on involuntary manslaughter. Whether involuntary manslaughter is a lesser included offense in this case is a nice question, but we are satisfied that it was properly refused because there was not a serious evidentiary dispute.

■ It is the intent element that distinguishes involuntary manslaughter, battery, and criminal recklessness from murder. *Simpson v. State*, 628 N.E.2d 1215, 1221 (Ind.Ct.App.1994), *trans. denied.* To prove murder, the State must show that the defendant knowingly killed. Ind.Code Ann. § 35–42–1–1 (West Supp.1997). To prove involuntary manslaughter, the State need show only that the defendant recklessly, knowingly, or intentionally inflicted serious bodily injury on another person, and killed that person in the course of such acts. Ind.Code Ann. § 35–42–1–4 (West 1986); Ind.Code Ann. § 35–41–2–2 (West 1986). This language is admittedly broad, but our cases shed additional light on the state of mind generally required to convict one of involuntary manslaughter by showing the defendant killed while violating our criminal recklessness statute.

■ As opposed to murder, the involuntary manslaughter statute, when coupled with the criminal recklessness statute, is generally applied to individuals who engage in random dangerous conduct which is not necessarily directed at another, but which results in the foreseeable death of another. The paradigmatic case occurs when an individual kills another while driving an automobile in a dangerous manner. In the present case, the facts indicate that Young knew the gun he pointed and fired at the gathered crowd was loaded. *Cf. Al–Saud v. State*, 658 N.E.2d 907 (Ind.1995) (unloaded gun can create a sufficient risk of bodily injury to others to convict of criminal recklessness). Young also must have realized people were standing in the general direction of his firing. Finally, Young's taunting words and the fact that he returned and fired more shots at the house resolves any dispute in our minds about whether Young's acts were somehow analogous to our involuntary manslaughter/criminal recklessness cases. Accordingly, there is no serious evidentiary dispute regarding whether Young committed the factually included lesser offense of involuntary manslaughter but not murder or reckless homicide. The trial judge was correct in refusing Young's tendered instruction on involuntary manslaughter.

### Conclusion

We reverse and remand for a new trial.

DICKSON, SULLIVAN, SELBY and BOEHM, JJ., concur.