Forrest **TURNER,** Appellant–
Petitioner,

v.

**STATE** of Indiana, Appellee–
Respondent.

No. 49A05–0008–PC–357.

Court of Appeals of Indiana.

June 18, 2001.

Hilary Bowe Ricks, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROOK, Judge.

### Case Summary

Appellant-petitioner Forrest Turner ("Turner") appeals the post-conviction court's denial of his petition. We reverse.

### Issue

Turner raises one issue, which we restate as whether under these particular circumstances manifest justice requires that he be granted a new trial despite a prior appellate panel's conclusion that lesser included instructions need not have been given.

### Facts and Procedural History

As stated in our original unpublished opinion, the facts most favorable to the judgment are as follows:

> On the night of August 19, 1995, Turner and David McCarthy ["McCarthy"] got into an argument with several individuals, including Josh Deem, Jimmy Gann, James McGinnis, Neil Weliver, and Robert Cardona. Turner and McCarthy were on the balcony of Turner's apartment and the other individuals were on the ground below. The individuals on the ground challenged Turner and McCarthy to a fight. Deem threw a bottle at Turner's vehicle, which activated the car alarm. Upon hearing the alarm, Turner stood on the balcony and began shooting in the direction of the people on the ground. Turner and McCarthy fired approximately twenty to thirty shots, "one after another." *Record* at 542.

> Turner shot Gann in the lower back from the apartment's balcony. After Gann fell and called for help, he saw Turner, who was then on the ground level, shoot at him three more times. Weliver observed Gann screaming and Turner "just standing there pointing his gun straight out." *Record* at 541. Deem, who ultimately died of a gunshot wound to his back, told Cardona that Turner had shot him.

> Turner told a police officer investigating the incident that, prior to the shooting, there had been "name calling and general confrontation" between the individuals on the ground and himself and McCarthy. *Record* at 262. Turner stated that "[the individuals] messed with my car and I went up and fired." *Record* at 262–63. Turner also said that he did not fear for his life at the time of the incident.

> Turner and McCarthy were tried as co-defendants. During trial, the defense requested instructions for the lesser offenses of reckless homicide and criminal recklessness. The trial court rejected these requests and Turner was convicted [of one count of murder, two counts of attempted murder, and one count of carrying a handgun without a license].

*Turner v. State*, 49A02–9612–CR–778, 691 N.E.2d 516, slip op. at 2–3 (Ind.Ct.App. Jan. 27, 1998). In his direct appeal, Turner argued that the trial court erred in refusing to instruct the jury on the lesser-included offenses of reckless homicide and criminal recklessness. In a memorandum opinion, a panel of this court concluded that there was no serious evidentiary dis-

pute concerning the element of intent, hence the trial court did not err. Both rehearing and transfer were denied.

On March 24, 2000, Turner filed a petition for post-conviction relief asserting: (1) that McCarthy had argued the same instructional issue in his separate appeal to a different panel of the appellate court; (2) that in a memorandum opinion handed down after Turner's appeal, said different panel had concluded that the trial court should have given both an instruction on reckless homicide as a lesser included offense of murder and an instruction on criminal recklessness as a lesser included offense of attempted murder;[1] (3) that McCarthy was later retried and convicted of the lesser-included offenses of reckless homicide and criminal recklessness; and (4) that Turner's case should be revisited due to the inequity between the result in his case as compared with the result in McCarthy's case.

Following a hearing, the post-conviction court entered its order denying Turner's petition and concluding:

> 8. The petitioner has requested this Court to find that the decision of the Court of Appeals of Indiana in this case is erroneous. The Court recognizes that the split panels have resulted in an inequity in these companion cases. However, the Court of Appeals has ruled that Mr. Turner's conviction and sentence herein are valid, and that the trial court did not err in refusing to instruct the jury on the lesser-included offenses. Such ruling is the law of this case, and *this* Court cannot change that law.

9. Petitioner's argument that *State v. Huffman* (Ind.1994) 643 N.E.2d 899 supports such a change is without merit. In *Huffman,* a change to the law post-appeal occurred and the change was applied retroactively to Huffman's case by the Indiana Supreme Court. No change in the law has occurred here. Further, *Huffman* states that "A court has the power to revisit prior decisions of its own *or of a coordinate court in any circumstance ...*" *Id.* at 901. "Coordinate", according to the American Heritage dictionary means "of equal rank or order." This Court concludes that such language does not empower the trial court to reconsider and reverse the ruling of the Court of Appeals in this case.

10. The law is with the State and against the Petitioner.

Turner appeals this order.

### Discussion and Decision

Turner's argument is as follows. At their joint trial, both he and McCarthy testified that they had not intended to injure anyone, but only to scare the young men who they felt were threatening them. However, the trial court refused to instruct the jury on reckless homicide and criminal recklessness as lesser-included offenses. Turner and McCarthy separately appealed this refusal. Different appellate panels reached opposite conclusions on this issue, resulting in McCarthy eventually receiving a retrial while Turner's convictions were affirmed. Turner contends that the appellate panel that decided his appeal erred in affirming the trial court and that manifest justice requires that he be granted a new trial. For support, he cites *State*

---

1. *McCarthy v. State,* 49A02–9802–CR–170, 703 N.E.2d 199, slip op. at 3–5 (Ind.Ct.App. Sept. 4, 1998). In that same opinion, the panel concluded that McCarthy had waived the criminal recklessness instruction issue because he had not joined in the request for such an instruction during the trial. Subsequently, McCarthy filed a petition for post-conviction relief alleging that his trial counsel was ineffective for failing to join in the request. When his petition was granted, he received a new trial.

*v. Huffman,* 643 N.E.2d 899, 901 (Ind. 1994), *Young v. State,* 699 N.E.2d 252, 255 (Ind.1998), and various cases that he claims stand for the proposition that the defendant's own testimony is sufficient to place the issue of intent into dispute, requiring that the lesser offense instruction be given. *See Champlain v. State,* 681 N.E.2d 696, 700–01 (Ind.1997); [2] *Sharkey v. State,* 672 N.E.2d 937, 941 (Ind.Ct.App. 1996), *trans. denied; Bragg v. State,* 695 N.E.2d 179, 180 (Ind.Ct.App.1998); *Harvey v. State,* 652 N.E.2d 876, 877 (Ind.Ct. App.1995), *trans. denied.*[3]

■ Our standard for reviewing post-conviction decisions is well-settled.

> When appealing the denial of a PCR petition, the appellant faces a rigorous standard of review. *The appellant must demonstrate that the evidence, when taken as a whole, is without conflict and leads unerringly and unmistakably to a conclusion opposite to that reached by the trial court.* We accept the trial court's findings of fact unless they are clearly erroneous, but we do not defer to the trial court's conclusions of law. [The PCR appellant] bears the burden of establishing his grounds by a preponderance of the evidence.

*Atchley v. State,* 730 N.E.2d 758, 762 (Ind. Ct.App.2000) (citations omitted) (emphasis added), *trans. denied.* We have stated that issues that were raised on direct appeal are not available for review post-conviction. *Clark v. State,* 648 N.E.2d 1187, 1190 (Ind.Ct.App.1995), *trans. denied.* That is, res judicata, which bars relitigation of issues previously adjudicated, applies to post-conviction proceedings. *Id.*

■ In an attempt to circumvent the oft-stated rule of res judicata in post-conviction cases, Turner cites *Huffman,* in which our supreme court stated:

> The law of the case doctrine mandates that an appellate court's determination of a legal issue binds both the trial court and the court on appeal in any subsequent appeal involving the same case and relevantly similar facts. The doctrine's admittedly important purpose is to minimize unnecessary relitigation of the legal issues once they have been resolved by an appellate court.
>
> With due respect for the doctrine of res judicata this Court has always maintained the option of reconsidering earlier cases in order to correct error. "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of *extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work manifest injustice.'"* Finality and fairness are both important goals. When faced with an apparent conflict between them, this Court unhesitatingly chooses the latter.

643 N.E.2d at 901 (citations omitted) (emphasis added). *Huffman* involved a change in the law, whereas the case at bar does not. However, *Huffman* does not appear to limit its application to change of law circumstances. Hence, we reiterate that while we should be loath to revisit prior decisions of this court, we do so under "extraordinary circumstances such as where the initial decision was 'clearly

---

**2.** In *Champlain,* there was more evidence to support the giving of the lesser-included instruction than merely the defendant's own testimony.

**3.** Both *Bragg* and *Harvey* concern whether a trial court should have given an instruction on self-defense—a different question than whether a lesser-included offense instruction should have been read. Thus, they do not support Turner's argument.

erroneous and would work manifest injustice.' " *Id.* We examine whether the present case meets that standard.

▆ Regarding lesser-included instructions, our supreme court has stated:

The analysis set forth in *Wright v. State*, 658 N.E.2d 563 (Ind.1995), determines whether a court should accept a party's instructions on lesser included offenses. Under this test the court must first decide whether the lesser included offense is either inherently or factually included within the crime charged by the prosecutor's information. *Id.* If the lesser offense is inherently or factually included, the trial judge must consider whether the evidence provided by both parties creates a serious evidentiary dispute about the element or elements which distinguish the greater from the lesser offense. *Id.* The failure of a trial court to accept and give a properly tendered instruction when a serious evidentiary dispute exists is reversible error if a jury could conclude that the lesser offense was committed but not the greater. *Id.*

The first two steps of the *Wright* test involve matters of law and an appellant need only demonstrate error to prevail on appeal. *When an instruction is refused on grounds that a serious evidentiary dispute does not exist, we reverse only when there is an abuse of discretion. See Champlain v. State,* 681 N.E.2d 696, 700 (Ind.1997). Where it is not apparent that the instruction was refused on that basis, we review the trial court's decision de novo. *Id.*

*Young,* 699 N.E.2d at 255 (emphasis added). An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the court. *Hauk v. State,* 729 N.E.2d 994, 1001 (Ind.2000).

▆ Reckless homicide is a killing committed with a plain, conscious, and unjustifiable disregard of harm that might result, and such disregard involves a substantial deviation from acceptable standards of conduct. IND.CODE §§ 35–42–1–5 and 35–41–2–2(c). Murder, on the other hand, requires as a minimum a killing committed by a perpetrator who engaged in the killing with an awareness of a high probability that he was doing so. IND. CODE §§ 35–42–1–1 and 35–41–2–2(b). Thus, an instruction on reckless homicide was not warranted if there was no serious evidentiary dispute but that defendant committed the attacks with an awareness of a high probability that he was engaged in killing. Criminal recklessness is committed when a person recklessly, knowingly, or intentionally performs an act that creates a substantial risk of bodily injury to another person. IND.CODE § 35–42–2–2. An instruction concerning criminal recklessness would have been required if a serious evidentiary dispute existed regarding the element that distinguishes murder from criminal recklessness, that is, intent to kill.

▆ As previously noted, the evidence in the present case revealed that upon being challenged to a fight and seeing someone throw a bottle at his vehicle, Turner responded by "shooting in the direction of the people on the ground" while he was safely up on a second floor balcony. *Turner,* slip op. at 2. Then,

Turner shot Gann in the lower back from the apartment's balcony. After Gann fell and called for help, he saw Turner, who was then on the ground level, shoot at him three more times. Weliver observed Gann screaming and Turner "just standing there pointing his gun straight out." *Record* at 541. Deem, who ultimately died of a gunshot

wound to his back, told Cardona that Turner had shot him.

. Turner told a police officer investigating the incident that, prior to the shooting, there had been "name calling and general confrontation" between the individuals on the ground and himself and McCarthy. *Record* at 262. Turner stated that "[the individuals] messed with my car and I went up and fired." *Record* at 262–63. Turner also said that he did not fear for his life at the time of the incident.

*Id.* at 2–3.

Given the above facts, one would be justified in concluding that Turner knowingly or intentionally killed Deem. However, the record also reveals contradictory evidence. The officer who Mirandized McCarthy testified that Turner told him he was shooting down at the ground in the direction of the parking lot. Moreover, on direct examination, Turner himself testified as follows:

Q. Did you fire the gun from the rail?

A. Yes, I did.

Q. In which direction?

A. But I fired—but first I had fired up and then I had fired down before I looked down.

Q. Did you point the gun at anybody?

A. *No, my intention was only just to scare them away.*

Q. How many shots did you fire from the rail?

A. I think I fired three up in the air. I don't know how many down.

Q. What did you do after that?

A. Well, I wanted to make sure these guys weren't going to come back up the stairs cause obviously they weren't still at our door any more; that didn't mean that they weren't on the balcony still. But I ran over to the stairs to guard the stairs and make sure that they weren't

coming up. It was just like an instinct thing just to make sure that they were going, you know, not come up any more.

Q. Point to where you went when you went down the steps.

A. I went over—I went over this way. So if I came out I was facing south so I was traveling east.

Q. If you came down the steps where were you standing?

A. May I say what happened before?

Q. Just answer the question.

A. Okay.

Q. When you came down the steps where were you standing?

A. Came down the steps?

Q. Yes.

A. I was—I was somewhere around this area. I mean, okay, right here is where the stairs are, and I was about right there.

. Q. Now why did you come out in the parking lot and fire shots?

A. Come down. Well, first of all, what happened was I came—the reason why I went down the stairs is cause I wanted to make sure that these guys were gone and then after I—all I heard was this isn't over. We're going to come back and get you, nigger, and so forth. And I heard—I only heard like maybe three, three different things. The third thing I don't remember what was said. But I heard the voices. They just seemed like they were coming out from around me. I had no idea where they were coming from so—

Q. Did you see anybody?

A. No, I didn't see anybody.

Q. How many shots did you fire from the parking lot?

A. I believe maybe two or three. But I fired—I fired up in the air. I mean—

Q. Did you ever point that gun at anybody down in the parking lot and shoot at them?

A. No, because I didn't see anybody. And even if I did see anybody I wouldn't have pointed at them anyway.

Q. Why did you stop shooting?

A. Well, the thing about it, I didn't see anybody any more so, I was like these guys have guns so I mean it's kind of stupid for me to sit down there, you know. Get back upstairs and up into the apartment. I mean plus, you know, *my intent, like I said, was to scare them away* and once, you know, they were— they weren't, you know, imminently around me then that's—I mean it was pointless to stay down there any more.

**THE COURT:** Next question.

Q. So what did you do when you went back upstairs?

A. What happened? I went back up the stairs and I passed up Luttrell, Grice and Lacey. They were passing me as I was walking across the balcony and so—

**THE COURT:** Sir, the question is what did you do when you went back upstairs.

A. Okay. Well, I went inside the apartment and I told—I asked—no, David, he asked me, he said: Did you shoot anybody? I said no. *I said I wasn't trying to.* I said: Did you hit anybody? He said no. And he asked me if I was hit and I said no. I meant I don't remember asking him if he was hit or not. After that happened I said, I said: Man, I told them—I told them to please leave. I said I didn't want any trouble.

Record at 821–25.

During cross-examination, Turner stated:

A. As far as them coming up on the balcony and as far as they left and came back with more men and about how I kept on sitting there trying to reason and reason and reason with them. I told him why I got the gun. I said I got the gun to visually deter them. *To visu-*

*ally scare them away. And that was all my intent was.* Oh, but I do remember this, too. He asked me, he said: When you went out the door did you realize that you were shooting at these men. I was shooting downward.

. . . .

A. [While out by a dumpster], I shot— fired the shots up into the air.

Q. And—

A. There was nobody around, for one thing.

Q. There was nobody around when you shot the gun in the air.

A. Yes, I did. Because I heard the voices and I didn't know where they were coming from.

Q. And you didn't see the person lying—I'm sorry. Finish your answer.

A. I said I heard the voices and I didn't know where they were coming from and they were saying how this wasn't over and how they were going to get me and said this isn't over, nigger, and so forth. And that's why I shot the guns up in the air to make sure that they were scared off.

Record at 840, 855–56 (emphases added).

■ Although the evidence cited in our original opinion is sufficient to support a conviction for murder, that conclusion is not compelled. Turner's testimony denying his intent to kill, compared with the other evidence, "shows a serious dispute concerning [Turner's] intent." *See Lynch v. State,* 571 N.E.2d 537, 539 (Ind.1991). We liken the present case to *Sharkey,* 672 N.E.2d 937, where the defendant repeatedly denied that he intended to kill the victim and we stated:

If the jury believed this denial, it could conclude that he killed Summers recklessly, or that she died as a result of battery. Therefore, there is a serious evidentiary dispute about the intent element, and in view of this dispute, the jury could conclude that either Involun-

tary Manslaughter or Reckless Homicide, and not the greater offenses of Murder or Voluntary Manslaughter, were committed. If the instructions on Involuntary Manslaughter and Reckless Homicide had been tendered, the trial court would have committed reversible error in refusing to give them.

*Id.* at 941. Similarly, if the jury believed Turner's testimony rather than other evidence in the record, it could have concluded that he killed without the intent required for a murder conviction. We stress that while the evidence contrary to Turner's testimony may appear quite strong to us,[4] we are not permitted to weigh testimony on appeal. Because there was a serious

evidentiary dispute regarding intent, the reckless homicide and criminal recklessness instructions should have been given. Accordingly, the trial court abused its discretion by denying the tendered instructions. Given that abuse of discretion and the disparity in outcomes between Turner's and McCarthy's cases, despite the similarity of the evidence presented by the defendants,[5] this case exemplifies one of those rare instances where our initial decision was "clearly erroneous and would work manifest injustice." Thus, Turner has demonstrated his entitlement to post-conviction relief in the form of a new trial.

In reaching our conclusion, we distinguish the cases where a defendant shoots

---

**4.** Indeed, the evidence against Turner seems stronger than the evidence against McCarthy.

**5.** For comparison's sake, we note that the officer who Mirandized him testified about McCarthy as follows:

Q. And [McCarthy] indicated to you that he had been out on the balcony shooting a gun.

A. Yes, sir. He did.

Q. And he indicated to you that he was shooting in the air and shooting on the ground trying to scare the people that were down below didn't he?

A. Yes, he did make that statement. Yes, sir.

Record at 367.

McCarthy himself testified as follows:

Q. What did you do then ... ?

A. At that point I fired my weapon right beside that individual. I fired my weapon beside to disburse them because I could not tell if our apartment was being fired at or not. There were several pops going on at that point.

Q. Did you know at that time where the pops you heard were coming from?

A. No I didn't, sir. There was a, I believe it's a hundred and ten decibel car alarm going off at that time. My audio depth perception, if you will, was not—was impaired by that. With the car alarm going off I couldn't tell where the shots were coming from or who—...

Q. Do you know—did you aim your gun at any single individual?

A. No, I didn't. I wanted to disburse the crowd.

. . .

Q. Do you know how many shots you fired?

A. I believe I fired seven shots.

Q. Did you see any individuals go down while you were shooting?

A. No, I did not.

Q. Could you estimate for the jury approximately how long it took you to fire those shots?

A. It took three seconds to let—approximately three seconds to let those seven shots off.

Record at 768–79. McCarthy further testified:

Q. Okay. Are you right handed or left handed?

A. I'm left handed.

Q. Why did you have the weapon in your right hand then?

A. Because that was—it happened to be the closest hand next to me when I pulled it off the kitchen counter because I was behind the refrigerator like this when the door was opened before and I was looking out. When I got it I took it with my right hand.

Q. Then you stepped out the door.

A. Yes. Things were happening very fast at that point.

Q. ... show the jurors what you did. How you fired.

A.. I looked. Saw the individual I believed to have a firearm pointed towards us. At

at a particular person at close range and *no* evidence contradicts the inference that the defendant knowingly or intentionally killed the victim. *See Miller v. State*, 720 N.E.2d 696, 699 (Ind.1999) ("As Defendant exited the gas station building, Frierson spotted Defendant and said, 'You act like you want to do something.' Defendant responded, 'What?' Defendant then pulled out a handgun and began shooting at Frierson. Defendant continued shooting as he walked toward Frierson's car, ultimately firing ten shots. One of the shots injured Frierson's right upper arm and chest while another fatal shot struck Frierson in the head. During the shooting, Frierson's car moved forward crashing into a guardrail."); *Sanders v. State*, 704 N.E.2d 119, 122–23 (Ind.1999) ("Sanders himself presented evidence that, as he stood at the bottom of the stairs, he aimed at and shot the person descending toward him.... *There is no evidence that he was shooting at the crowd on the stairs at random; rather, he shot only at Ruben Rodriguez.* There was no serious evidentiary dispute

that Sanders knowingly shot Rodriguez, because Sanders must have known that firing directly at a person at such close range is highly probable to result in death. Therefore, the trial court appropriately refused Sanders' homicide instruction on reckless homicide.") (emphasis added).

■ As a final note, we echo our supreme court's words: "when the question to instruct on a lesser included offense is a close one, it is prudent for the trial court to give the instruction and avoid the risk of the expense and delay involved in a retrial." *Champlain*, 681 N.E.2d at 701 (citing *Griffin v. State*, 644 N.E.2d 561, 563 (Ind. 1994) (murder conviction reversed for failure to instruct jury on voluntary manslaughter)).

Reversed.

ROBB, J., and VAIDIK, J., concur.

that time I was still in motion from coming out. I went down like this instinctively, as far as to take cover behind the railing. Put one hand over and fired down—

Q. Did you fire—
A. —towards the ground.
Q. —with your right hand or your left hand?
A. My right hand.
Q. So you never even transferred it—
A. No, I didn't.
Q. —to your good hand? Why didn't you do that if you were going to use that firearm?
A. I just reacted under the circumstances, sir. I felt that there wasn't time to transfer it to my left hand. I figured that this would just have to do to disburse them.
. . .
A. ... As I went down like this my view was obscured for about I'd say two, two and a half seconds, as I let three or four shots off. Then I saw that they were running as I came—as I came back up, put the other two in the air cause I was like this.

Those two flew back at the eject—they eject sideways but I had it sideways at that point. One flew back over my shoulder. One flew back and hit me in the head.
Record at 773–75. In addition, McCarthy testified:
A. I was asked did you fire a weapon. I stated yes, I did. They stated: How many rounds did you fire? I said: I believe I fired about five or six.
Q. Did you tell them where you fired? In what direction?
A. Yes, sir. I stated that I fired out toward the ground and that I fired in the air to disburse the crowd.
Q. ... did there come a point in time where you learned that somebody or some people had been hit by gun fire?
A. Yes.
Q. When—when was that?
A. The first time I thought there might be somebody hit was when the ambulance showed up.
Record at 780.