**FOR PUBLICATION**



FILED
Oct 25 2013, 5:52 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW J. MCGOVERN**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE M. COOPER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL A. LANE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 82A05-1212-CR-640 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

**APPEAL FROM THE VANDERBURGH CIRCUIT COURT**
The Honorable Kelli E. Fink, Judge
Cause No. 82C01-1110-MR-1284

**October 25, 2013**

**OPINION - FOR PUBLICATION**

**FRIEDLANDER, Judge**

Michael A. Lane appeals his convictions for Murder,[1] class B felony Conspiracy to Commit Dealing in a Schedule II Controlled Substance,[2] and two counts of class C felony Criminal Recklessness.[3] He presents the following restated issues for review:

1. Did the trial court abuse its discretion by rejecting Lane's tendered jury instruction on reckless homicide as a lesser included offense of murder?

2. Did the trial court abuse its discretion by admitting certain hearsay evidence after concluding that Lane had opened the door to this previously excluded evidence?

We affirm.

On January 5, 2010, Jason Derrington arranged a drug deal between Michael Hooper and David Clark, in which Clark was to purchase $5000 worth of Oxycontin from Hooper. Hooper was Derrington's friend, and Derrington had facilitated a number of drug deals between Hooper and Clark in the past. At some point that day, Clark informed Derrington that he was unavailable and would be sending money for the transaction with Lane, whom Derrington knew as "Little Mike". Derrington had met Lane several times before through Clark and felt comfortable with the last-minute change. Clark instructed Derrington to meet Lane in the back parking lot of the Sunburst Apartments in Evansville.

Derrington went to Hooper's residence that evening and informed him of the change in plans. Hooper did not know Lane, so he decided to stop first at the home of Frank Hurst, Hooper's cousin. Hooper asked Hurst to give them a ride, and Hurst agreed. Hurst had one handgun on his person and one in the glove box of his car. He had permits for both weapons.

---

[1] Ind. Code Ann. § 35-42-1-1 (West, Westlaw current with all 2013 legislation).
[2] Ind. Code Ann. § 35-48-4-2 (West, Westlaw current with all 2013 legislation); Ind. Code Ann. § 35-41-5-2 (West, Westlaw current with all 2013 legislation) (conspiracy).
[3] I.C. § 35-42-2-2 (West, Westlaw current with all 2013 legislation).

Hurst apparently did not know Derrington or Lane and was allegedly unaware that he was driving Derrington and Hooper to a drug deal. Hooper sat in the front passenger seat of Hurst's vehicle, and Derrington sat directly behind Hurst.

The group arrived at the parking lot before 8:00 that evening and sat in the car while Derrington texted and made phone calls. After several minutes, Hooper asked Derrington, "where's he at", and Derrington responded, "he's coming". *Transcript* at 425, 426. At some point after 8:00, Lane got into the vehicle and sat in the back seat next to Derrington and behind Hooper. Hooper passed a bottle of Oxycontin to Lane, and Lane handed a Crown Royal bag filled with money to Derrington. Hooper directed Derrington to count the money. As Derrington began counting some of the money from the bag, he heard Lane's door open and saw the bag of remaining money move. Derrington grabbed the bag back but then realized that Lane had a gun. Lane started shooting as he exited the car. He first shot Derrington in the leg and then shot Hooper in the back near his right armpit as Hooper had his hands in the air. Lane shot Hooper at close range, with the shot coming from inside the car likely between the front passenger seat and the door frame.[4] Neither Derrington nor Hooper were armed.

After the first two shots, Derrington fled from the car and Hurst retrieved his .38 caliber revolver from the glove box and fired four shots. At that point, Lane was standing outside and firing into the car. Lane shot Hurst in the chest during the crossfire. Lane also

---

[4] The trajectory of the bullet travelled from above to below and from back to front. This bullet bounced around in Hooper's body, eventually striking his liver and heart. In addition to this fatal gunshot wound, Hooper also had injuries to his scalp, forehead, and hand that were consistent with collapsing on hard pavement.

3

went around the back of the vehicle and shot at Derrington as he fled. Derrington was struck in the back by one of Lane's shots, which caused immediate and permanent paralysis. Lane then fled the scene. At some point, Hooper and Hurst also exited the car, but Hurst reentered and placed his revolver back in the glove box.[5]

Evansville police received the first dispatch call at 8:24. Upon arriving at the scene, officers found Hooper dead or near death behind Hurst's car, Derrington seriously injured on the ground near the driver's door, and Hurst injured in the driver's seat. There was also $4000 in cash strewn in the backseat and floorboard, along with a Crown Royal bag. Hurst immediately informed officers that he was armed. Both Hurst and Derrington identified the shooter as "Little Mike". Derrington also indicated that he had Little Mike's phone number in his cell phone. After securing the scene, officers discovered that this number was 812-454-7192, which was Lane's number. Within an hour of the shooting, Derrington was presented with three photo arrays. Derrington, without hesitation, identified Lane from the third photo array. At the hospital, Hurst also identified Lane as the shooter but then expressed some brief hesitation. The following day, January 6, 2010, the State filed charges against Lane for murder, felony murder, two counts of attempted murder, and conspiracy to deal in a schedule II controlled substance.

Lane evaded capture until October 2011, when he was arrested in Chicago on the outstanding warrant. Detective Brent Melton traveled with two other officers to pick up

---

[5] The bullets later removed from Hooper, Derrington, and Hurst were all fired from the same weapon. This weapon was never located.

4

Lane in Chicago. Melton read Lane his *Miranda* rights before transporting him back to Evansville. While talking with Melton on the drive back to Evansville, Lane adamantly stated that the money he brought to the scene was his own money, not David Clark's.

Lane's first jury trial commenced on August 7, 2012 but ended in a mistrial because only eleven jurors were selected following voir dire. The second trial commenced on October 8, 2012 and lasted five days. Among many other witnesses, Hurst and Derrington testified against Lane. The jury found Lane guilty of murder, two counts of criminal recklessness as a lesser-included offense of attempted murder, and conspiracy to commit murder.[6] Before sentencing, Lane filed a motion for a new trial, arguing that the trial court abused its discretion when it refused his tendered lesser-included-offense instruction on reckless homicide. The trial court denied this motion and subsequently sentenced Lane to an aggregate sentence of fifty-five years in prison. Lane now appeals. Additional facts will be provided below as needed.

1.

Lane argues that the trial court abused its discretion by refusing to instruct the jury on reckless homicide as a lesser-included offense of murder. He claims a serious evidentiary dispute existed regarding his state of mind at the time of the shooting. Specifically, Lane argues that the evidence supported a reasonable inference that Hooper, Hurst, and Derrington ambushed Lane and that "Lane fired wildly in retreat to scare [them] away." *Appellant's*

---

[6] Following the State's presentation of evidence, the trial court granted Lane's motion for a directed verdict on the felony murder charge because the State failed to allege a statutory predicate felony in the information to support this charge.

5

*Brief* at 9.[7]

When considering instructions on lesser-included offenses, a court must first determine whether the lesser offense is either inherently or factually included within the crime charged. *Young v. State*, 699 N.E.2d 252 (Ind. 1998). It is well established that reckless homicide is an inherently included lesser offense of murder. *Id*. Accordingly, the next step in the analysis of whether the instruction should be given is "whether the evidence provided by both parties creates a serious evidentiary dispute about the element or elements which distinguish the greater from the lesser offense." *Id*. at 255.

When an instruction is refused on grounds that a serious evidentiary dispute does not exist, as in the instant case, we reverse only upon an abuse of discretion. *Young v. State*, 699 N.E.2d 252. "An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the court." *Turner v. State*, 751 N.E.2d 726, 731 (Ind. Ct. App. 2001), *trans. denied*.

The only difference between murder and reckless homicide is the mens rea the State must prove to obtain a conviction. *Young v. State*, 699 N.E.2d 252. Reckless homicide

---

[7] Lane also asserts that the record "clearly establishes that the jury thought the shooting was reckless." *Id*. at 11. He claims this is so because the jury found him guilty for the shootings of Derrington and Hurst of only criminal recklessness, not attempted murder. This logic is misguided. First, we observe that the jury found Lane guilty of murder, which necessarily indicates that they found his mens rea to be knowing, at the least. Further, Lane's argument ignores the fact that a conviction for attempted murder requires proof of a specific intent to kill, while a murder conviction requires only a knowing killing. *See Henley v. State*, 881 N.E.2d 639 (Ind. 2008). Thus, the fact that the jury determined that Lane did not have the specific intent to kill Derrington and Hurst says nothing about whether he had a knowing mens rea with respect to the shooting of Hooper. Finally, Lane's argument is premised on a belief that the crime of criminal recklessness applies to only reckless conduct, which it does not. I.C. § 35-42-2-2(b) indicates that criminal recklessness may involve reckless, knowing, or intentional conduct. In other words, in convicting him of criminal recklessness rather than attempted murder, the jury could have concluded that Lane knowingly shot Hooper but did not intend to kill him.

6

requires proof that he defendant acted recklessly, while murder requires knowing or intentional conduct. *See* I.C. § 35-42-1-5; I.C. § 35-42-1-1. Thus, the issue here is whether the evidence presented at trial by both parties created a serious evidentiary dispute about whether Lane knowingly or recklessly killed Hooper when he shot him in the back.[8] The trial court answered this question in the negative, explaining:

> the evidence in this case was that the shooter actually shot into the car, that there were three people in close proximity in that vehicle, I do not think there was any evidence to dispute the fact that whoever shot into that car did it in a knowing fashion and aware of what the consequences of that action would be[.]

*Transcript* at 773.

"A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35-41-2-2(b) (West, Westlaw current with all 2013 legislation). On the other hand, conduct is reckless if the actor engaged in said conduct "in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." I.C. § 35-41-2-2(c).

After a thorough review of the record, we conclude that the trial court did not abuse its discretion when it found no serious evidentiary dispute regarding whether Lane knowingly or recklessly shot Hooper. The evidence presented at trial reveals that Lane shot Derrington and then Hooper (both unarmed) while exiting the car after a botched drug transaction. Lane shot

---

8  We do not consider whether Lane intentionally killed Hooper because the information alleged only that he knowingly killed Hooper.

Hooper in the back as Hooper sat in the front passenger seat with his hands up. The location of the wound on Hooper's body and the pathologist's description of the bullet's trajectory are consistent with Derrington's testimony of how and where Hooper was shot. After Derrington and Hooper were shot, Hurst returned fire and was then shot by Lane. The fact that Lane shot wildly in retreat once he was out of the vehicle and realized Hurst was firing back does not change the fact that he shot Hooper at close range in the back as he exited the car.

Further, although not dispositive, we observe that the theory of Lane's defense was that he was not present on the night in question. In fact, defense counsel indicated on more than one occasion that "this case stands and falls on identification." *Transcript* at 742. Lane failed to argue to the jury and presented no evidence that the shooter was ambushed by the alleged victims and shot only in an effort to get away as Hurst fired at him. While Lane makes this claim now on appeal, we cannot agree that the evidence presented below by both parties supports an inference that "Lane was ambushed by Derrington, Hurst, and Hooper, and that Lane fired wildly in retreat." *Appellant's Brief* at 15. While there are certainly minor inconsistencies in the evidence, the undisputed evidence indicates that Lane fired the first two shots into the car as he exited, striking two different victims. These shots were fired at close range. His second shot struck Hooper in the back as Hooper sat in the front seat with his arms up.

We agree with the trial court that the facts presented at trial do not create a serious evidentiary dispute as to whether Lane killed Hooper knowingly or recklessly. In other words, there is not a serious evidentiary dispute that Lane shot Hooper with anything less

8

than an awareness of a high probability that he was engaged in killing.

The cases cited by Lane are distinguishable from the instant case. In *Turner v. State*, the defendant fired shots from a second-floor balcony after being challenged to a fight by a crowd below and seeing someone throw a bottle at his vehicle. There was contradictory evidence presented as to whether Turner was shooting at individuals or whether he was simply firing in the air and toward the ground to scare the crowd away. Turner himself testified that his intent was only to scare them away and that he was not trying to hit anyone. In light of the defendant's testimony denying an intent to kill, our Supreme Court determined that a serious evidentiary dispute existed regarding his intent. *Turner v. State*, 751 N.E.2d 726. In the instant case, Lane did not testify or present other evidence of a contrary intent.

*Young v. State*, 699 N.E.2d 252, is similarly distinguishable. In that case, a crowd was outside a residence at dark watching two individuals wrestle, when a car went by with Young hanging out the passenger-side window with a gun. The car abruptly stopped and Young shouted several times to the crowd. He then told the driver to pull off as he fired two shots. One of the shots struck Korey Roney in the back of the head. Shortly thereafter, the car turned around and came back quickly. Everyone ran inside except Roney, who was on the ground. Young was seated on the passenger-side door with his arms extended over the car. He fired four more shots as the car passed. No one else was injured and several bullets struck a house immediately south of the house where Roney was shot.

Several of the witnesses at the scene testified that there had been no problems between Young and those in the front yard that night and some even indicated that he was a friend.

9

No witness stated that Young appeared to be aiming his gun at any specific person, and one witness testified, "he was just shootin'…dude was pullin' off, you know." *Id*. at 256. In determining that a serious evidentiary dispute existed as to whether Young knowingly or recklessly killed Roney, our Supreme Court noted the lack of evidence regarding motive or intent to target a certain person. Further, the Court stated:

> The evidence about Young's state of mind at the time he fired the shot that killed Korey Roney is both conflicting and obscure…. Though shooting in the direction of numerous people only twenty feet away is obviously "reckless" behavior no matter whether one is in a set or moving position, whether [Young's] acts are sufficient to show he was aware of a high probability that his act would kill is less certain.
> While it is [his] mental state when he fired the shot which actually killed Korey that would determine whether he committed murder or reckless homicide, a jury might glean inferences from the larger pattern of shots fired to determine this specific mens rea. Of the estimated six shots fired, one bullet his Korey…, another was discovered rather far away in a wall of the home next door…. A crime scene specialist was unable to say whether the recovered bullets were fired [randomly] or specifically aimed. Also possibly relevant is the fact that [Young] returned and fired four more shots though all except Korey were inside the home. Korey was prone on the ground during this time but was not shot again.
> A jury considering these facts could well have found [Young] was acting recklessly but not knowingly when he fired the shot that killed Korey. Firing a handgun towards a group of people only twenty feet away is certainly an act committed in "plain, conscious, and unjustifiable disregard" of the harm that might result, and a "substantial deviation from acceptable standards of conduct," but given the specific facts of this case, a jury might reasonably decide that such behavior did not reflect a knowing killing.

*Id*. at 256-57 (citations omitted).

Contrary to Lane's assertion on appeal, the facts of the instant case are not on par with those in *Young*. Here, the evidence established a clear motive for the shooting. Further, unlike in *Young*, the eyewitness testimony does not indicate that Lane was firing wildly and

10

not targeting Hooper when he shot him in the back. On the contrary, the evidence indicates that Lane shot Hooper at close range as Lane was exiting the car. Lane also shot the other two individuals who were with Hooper that night. Although Lane's shots apparently became dispersed after he shot Hooper, the evidence indicates this is because Hurst returned fire. On the specific facts of this case, a jury could not reasonably conclude that Lane acted recklessly but not knowingly when he fired the shot that killed Hooper. An instruction on reckless homicide was, therefore, not warranted.

2.

Lane contends that certain evidence was admitted in violation of his right to confront witnesses against him. He claims the trial court erroneously determined that he had opened the door to this evidence during cross-examination of the lead detective, Brent Melton.

During trial, evidence was admitted indicating that Derrington had made four calls with his cellphone to 678-372-6455 at 6:51, 8:10, 8:13, and 8:18 on the night of the shooting. The State did not initially seek to introduce evidence linking this phone number to a particular person, and the trial court denied a jury question seeking this information.

On cross-examination, defense counsel asked Detective Melton about inconsistencies in the testimonies of the victims and the lack of physical evidence from the scene linking Lane to the crime. Counsel also reviewed with the witness the evidence police had against Lane including the identifications by both surviving victims and the contact phone number listed for "Little Mike" in Derrington's cellphone, with police tying both the nickname and the number (812-454-7192) to Lane. The cross-examination continued in part as follows:

11

Q       And beyond that all of the evidence that was in the boxes and all the evidence that's in the bags and all the evidence that's been introduce[d], there's nothing else that ties Michael Lane to this crime?

A       The statement he made to me in the car on the way back from Chicago?

Q       Assuming you got that statement correct….

A       Yes.

Q       That's it?

A       I believe so.

*Transcript* at 629.

During a subsequent sidebar, the State argued that Lane had opened the door to hearsay evidence linking the 678-372-6455 number to Lane. The State claimed the door was opened when the defense asked Detective Melton if there was nothing else that tied Lane to the crime. In fact, police had learned during an interview with Obie Davis (Lane's cousin) that the 678 number was affiliated with Lane.

Following a brief recess, the trial court ruled in favor of the State as follows:

[Court:]       I do believe that [defense counsel's question] gives the impression to the jury that there's nothing else that this Detective relied on to tie Mr. Lane to the crime and therefore I do think it's opened the door to the evidence of the telephone number….

                                        ***

[Defense:]    Well, with regard to the Court's ruling, defendant's position is that this is hearsay evidence, that the admission of said evidence violates Crawford in that the declarant is not available to be cross examined about the information that the officer is going to testify to, Mr. Davis isn't here, apparently has never been under subpoena by the State….

                                        ***

[Court:]       I do agree that there is, I had sustained a hearsay objection to this evidence previously, but under open the door and the cases that talk about opening the door does indicate that otherwise inadmissible evidence can be admissible if the door opens and I think that's occurred in this case, so any other record?

*Id*. at 643-44.

On re-direct examination, the State elicited the following testimony:

Q Detective, you were asked a question that there was nothing else that tied Michael Lane to the crime, do you remember that question?
A Yes, sir.
Q That's not actually true, is it?
A No.
Q Did you receive a phone number from Obie Davis for a contact number for Mr. Lane?
A Yes.
Q What was that number, sir?
A Ah, missed call from Lane, the cell number was 678-372-6455.

*** 

Q Do you recall Officer Sides testifying as to four phone numbers [sic] to that particular number from Jason Derrington's phone?
A Yes, I do.
Q Alright, and those calls were made at 6:51, 8:10, 8:13 and 8:18 on the night in question, is that correct?
A Yes.

*Id*. at 645-46.

We initially determine whether the admission of this hearsay evidence violated the Confrontation Clause, which is embodied in the Sixth Amendment to the United States Constitution. The clause prohibits the admission of an out-of-court statement if it is testimonial, the declarant is unavailable, and the defendant had no prior opportunity to cross-examine the declarant. *King v. State*, 985 N.E.2d 755 (Ind. Ct. App. 2013), *trans. denied*. The only issue in this case is whether Davis's statement to police regarding the phone number was testimonial.

To determine whether a statement such as this is testimonial, we look at the primary purpose of the conversation between police and the declarant. *Id*. If the circumstances indicate that the primary purpose of the conversation was to gather evidence of past events

13

potentially relevant to later criminal prosecution, then the statements are testimonial and protected by the Confrontation Clause.[9] *King v. State*, 985 N.E.2d 755.

The State argues that the statement given by Davis during police questioning was not testimonial because its "original purpose" was not to create a record for trial but to "assist police in identifying the person who committed the crimes against Hooper, Derrington, and Hurst." *Appellee's Brief* at 24. We cannot agree. The record indicates that Lane was the primary suspect within an hour or two of the shooting and well before Detective Melton interviewed Davis. The purpose of the interview was to gather evidence and to locate Lane. Further, there was no ongoing emergency when Davis was formally questioned several days after the shooting. The statement was clearly testimonial.

Despite the nature of this hearsay statement, the trial court found it admissible because Lane had opened the door. As a matter of modern evidence law, the trial court may well have been correct in determining that Lane opened the door to admission of this evidence. *See Kubsch v. State*, 784 N.E.2d 905 (Ind. 2003). We must be mindful, however, that we are faced with a constitutional challenge to the admission of Davis's testimonial statement rather than a challenge based on evidentiary rules.

---

[9] Factors to be considered include:
> (1) whether the declarant was describing events "as they were actually happening" or past events; (2) whether the declarant was facing an ongoing emergency; (3) whether the nature of what was asked and answered was such that the elicited statements were necessary to be able to resolve the present emergency rather than simply to learn about past events; and (4) the level of formality of the interview.

*Id.* at 758 (quoting *State v. Martin,* 885 N.E.2d 18, 20 (Ind. Ct. App. 2008)).

Several other jurisdictions that have decided cases after *Crawford v. Washington*, 541 U.S. 36 (2004), have applied the "open the door" rule in holding testimonial hearsay admissible where the defendant has opened the door to such evidence. *See*, *e.g.*, *United States v. Holmes*, 620 F.3d 836 (8th Cir. 2010); *United States v. Lopez-Mendia*, 596 F.3d 716 (10th Cir. 2010); *People v. Rogers*, --- P.3d ---, 2012 WL 5457358 (Col. Ct. App. 2012); *State v. Birth*, 158 P.3d 345 (Kan. Ct. App. 2007). At least one jurisdiction has concluded otherwise:

> If there is one theme that emerges from *Crawford,* it is that the Confrontation Clause confers a powerful and fundamental right that is no longer subsumed by the evidentiary rules governing the admission of hearsay statements. Thus, the mere fact that Cromer may have opened the door to the testimonial, out-of-court statement that violated his confrontation right is not sufficient to erase that violation. In this, too, we agree with Professor Friedman, who has postulated that a defendant only forfeits his confrontation right if his own wrongful conduct is responsible for his inability to confront the witness. Friedman, *Confrontation,* 86 Geo. L.J. at 1031. If, for example, the witness is only unavailable to testify because the defendant has killed or intimidated her, then the defendant has forfeited his right to confront that witness. A foolish strategic decision does not rise to the level of such misconduct and so will not cause the defendant to forfeit his rights under the Confrontation Clause.

*United States v. Cromer*, 389 F.3d 662, 679 (6th Cir. 2004).

We agree with the majority of jurisdictions that have found that a defendant can open the door to the admission of evidence otherwise barred by the Confrontation Clause. This waiver of rights, however, is not as broadly applied as in non-constitutional contexts due to the presumption against the waiver of constitutional rights. *See United States v. Holmes*, 620 F.3d 836. We hold that for a waiver of the fundamental constitutional right of confrontation to be effective, such waiver must be "clear and intentional." *Id.* at 843 ("decision to

waive…must be done intentionally and for valid, tactical purposes"). *See also United States v. Lopez-Mendia,* 596 F.3d at 731 ("[w]here, as here, defense counsel purposefully and explicitly opens the door on a particular (and otherwise inadmissible) line of questioning, such conduct operates as a limited waiver"). The standard is not met here, as there is no indication in the record that the alleged waiver was done intentionally. Accordingly, the trial court erred in concluding that Lane opened the door to admission of this testimonial statement.

Violations of the Confrontation Clause do not require reversal if the State can show beyond a reasonable doubt that the error was harmless and did not affect the verdict. *Koenig v. State*, 933 N.E.2d 1271 (Ind. 2010). In other words, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Id*. at 1273. When considering whether a constitutional error was harmless, we may consider, among other things:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted and, of course, the overall strength of the prosecution's case.

*Id.* (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 684, (1986)). If the State presented other overwhelming evidence of the defendant's guilt, then an erroneously admitted statement may be deemed harmless. *See Rawley v. State*, 724 N.E.2d 1087 (Ind. 2000); *Finney v. State*, 786 N.E.2d 764 (Ind. Ct. App. 2003).

We are confident that the brief testimonial hearsay evidence admitted through Detective Melton was harmless beyond a reasonable doubt. Although the evidence regarding the phone number tended to establish some link between Lane and the crime, this link had already been shown by other overwhelming evidence establishing that Lane came to the scene to transact a drug deal that ended badly. Derrington, who knew Lane prior to the shooting, identified Lane as the shooter while laying paralyzed at the scene, in a photo array at the hospital hours after the shooting, and at trial.[10] The other surviving victim, Hurst, similarly identified Lane. Further, upon his arrest, Lane admitted to Detective Melton that the money he (Lane) brought to the scene was his own. Thousands of dollars, along with a Crown Royal bag, were also found in the back of the car.

In light of this overwhelming evidence placing Lane at the scene to complete a drug buy, the admission of additional evidence that, before the shooting, Derrington made calls to a phone number associated with Lane did not affect the verdict. The error was harmless beyond a reasonable doubt.

Judgment affirmed.

BAKER, J., and VAIDIK, J., concur.

---

[10] Lane asserts that Derrington (as well as Hurst) had a profound motive to lie and that "the State presented very little evidence that placed Lane at the scene." *Appellant's Brief* at 31. The record indicates that Derrington openly admitted that he facilitated the drug deal, as he had in the past. He did not shy away from implicating himself in criminal activity. Moreover, Lane does not explain why Derrington and Hurst would have had a motive to wrongly identify the man who shot them and their friend/cousin.