## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 30 2020, 8:46 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer L. Koethe
Navarre, Florida

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tina L. Mann
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jae'Vianne Camerial Aldridge,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 30, 2020

Court of Appeals Case No.
20A-CR-264

Appeal from the LaPorte Superior Court

The Honorable Michael Bergerson, Judge

Trial Court Cause No.
46D01-1807-MR-6

**Pyle, Judge.**

## Statement of the Case

Jae'Vianne Camerial Aldridge ("Aldridge") appeals, following a jury trial, her conviction for Level 5 felony reckless homicide.[1] Aldridge argues that the State failed to present sufficient evidence to support her conviction. Concluding that the State presented sufficient evidence, we affirm her conviction.

We affirm.

## Issue

Whether the State presented sufficient evidence to support Aldridge's reckless homicide conviction.

## Facts

On July 25, 2018, around 9:00 p.m., fifteen-year-old M.G. was "jumped" and beaten up by a group of girls while outside an apartment complex in Michigan City. (Tr. Vol. 2 at 222). M.G. was on the phone with her sister, Kenya Atterberry ("Atterberry"), at the time of the attack. Someone videotaped the encounter and sent it via Facebook Messenger to Atterberry.

Atterberry showed the video to some of M.G.'s family members ("the Family"), who became very upset. The Family included: M.G.'s mother, LaTonya Walker ("M.G.'s mother"); M.G.'s uncle, Joe Pryor ("Pryor"); M.G.'s aunt, Lateda Walker ("Lateda"); and M.G.'s cousins, seventeen-year-

---

[1] IND. CODE § 35-42-1-5.

old Karlos Dickson ("Karlos"), nineteen-year-old Jason Dickson ("Jason"), and Divine Russell ("Russell").

[5] When watching the video, Atterberry, who had known eighteen-year-old Aldridge from high school, recognized Aldridge's teenaged sister, J.F. ("J.F."), as one of the people who had jumped M.G. Atterberry then called Aldridge through Facebook voice and texted her through Facebook Messenger. They talked about fighting, and Aldridge texted an address to Atterberry. The address Aldridge gave was to a house on Woodland Avenue ("Woodland house"), which belonged to Jonisha Mussa ("Mussa"). The Family then drove in three cars to the Woodland house around 10:00 p.m. The Family did not have any guns or weapons.

[6] When the Family arrived at the Woodland house, two females were "hollering" on the front porch. (Tr. Vol. 3 at 186). While some of the Family stayed in their cars, Atterberry, Karlos, and Jason went into the front yard, where Atterberry had a "verbal confrontation" with the females. (Tr. Vol. 3 at 101). The females then walked to the side of the house and went inside through a side door. Aldridge was inside the house along Mussa, J.F., another of Aldridge's sisters, Aldridge's girlfriend, a male, and some other people.[2]

---

[2] J.F., Mussa, and Aldridge's other sister had been involved in the incident against M.G. at the apartment complex.

[7] Atterberry, Karlos, and Jason went to the side of the house and argued with the people on the inside. M.G.'s mother pushed on the window air conditioning unit, which fell inside the house. Karlos, who was a football player[3], then shoved the side door open with his shoulder. Atterberry, Karlos, and Jason went inside the house, and the people inside then ran out the front door and into the front yard. Once in the front yard and in the dark of the night, "the brawl start[ed]" and "[e]verybody got to fighting." (Tr. Vol. 2 at 235; Tr. Vol. 3 at 63, 64). There were "fights everywhere[,]" people were "yelling[,]" "hitting, pushing," and "running," and people were "coming from the back of the house[.]" (Tr. Vol. 3 at 190). Atterberry, Karlos, and Jason fought with Aldridge and some of the others from the Woodland house. At one point, after Karlos got hit, he grabbed that person, picked her up, and threw her to the ground.

[8] Walker, Pryor, and Russell, who had stayed in the car, watched the "[f]ist fighting" in the yard for ten minutes until Pryor said that the fighting "was enough." (Tr. Vol. 3 at 17). Pryor, Walker, and Russell got out the car and walked into the front yard "to break the fight up." (Tr. Vol. 2 at 240). Pryor grabbed Karlos and told him to stop.

[9] Aldridge, who was standing at the front door, took her Taurus .38 caliber handgun from the jacket she was wearing, and shot her gun three times. One of

---

[3] At the time of the December 2019 trial, nineteen-year-old Karlos was six feet, eight inches tall and weighed about 375 pounds.

the bullets struck Pryor's head, just above his right eyebrow. Aldridge then ran into the house, hid the gun in the house, and fled the scene.

[10] Michigan City Police Department officers were dispatched to the scene around 10:45 p.m. When the officers arrived, they encountered a "hectic" and "extremely chaotic" scene. (Tr. Vol. 2 at 67, 82, 112). There were over twenty people on the street and "people [were] all over the place yelling and screaming, running all over[.]" (Tr. Vol. 2 at 83). The police found Pryor lying on the front lawn. Pryor had a gunshot wound to his head and was unresponsive. Pryor died as a result of the gunshot wound.

[11] The State charged Aldridge with murder. The trial court held a five-day day jury trial in December 2019. There was no dispute that Aldridge had shot the gun and that Pryor had died as a result of Aldridge's shooting. Aldridge's theory of defense to the murder charge was self-defense. Her alternative defense was that her act of shooting was done recklessly. During opening statements, Aldridge's counsel stated that Aldridge had heard her sister say that someone had a gun and then Aldridge had "shot three bullets blindly, not aimed at anybody in particular." (Tr. Vol. 2 at 49).

[12] During the trial, various police officers and the Family testified to the facts above.[4] The parties stipulated "[t]here was no evidence of close range firing"

---

[4] Jason and Karlos testified under use immunity, which had been sought by the State and granted by the trial court.

and that the gun had been "fired from a distance of greater than four (4) feet from Joseph Pryor." (Ex. Vol. at 102). Additionally, Russell testified that she had seen Aldridge shoot the gun and that Aldridge had "pointed [it] up first[.]" (Tr. Vol. 3 at 216). Russell also testified that Aldridge had shot the gun three times, with Aldridge shooting the first shot "up[,]" the second shot hitting Pryor, and the third shot "just went off anywhere." (Tr. Vol. 3 at 222). Russell also testified that she had used her cell phone to record a few seconds when Aldridge had started shooting but that it was difficult to see. The State introduced into evidence the short video and some grainy photographs taken from the video that showed a shadowy figure who was standing by the front door with a gun.

[13] During Aldridge's case-in-chief, she called Mussa as a witness. Mussa testified that some of the Family had guns when they were at the Woodland house. On cross-examination, Mussa acknowledged that when she had been interviewed by the police, she had not told the police that some of the Family had guns.

[14] When Aldridge testified on her own behalf, she indicated that she had not seen anyone with guns. Aldridge testified that she, however, had a gun in her jacket. Aldridge also testified that, before she shot her gun, a "big guy" had picked her up and slammed her to the ground and a "whole bunch" of people had beat and pushed her. (Tr. Vol. 4 at 98, 99). Aldridge indicated that once she had been able to get away from them, she then had run toward the front door and had heard her sister say that someone had a gun. Aldridge testified that she also had heard M.G.'s mother say, "Get that dyke bitch. Kill that dyke bitch." (Tr.

Vol. 4 at 100). Aldridge testified that when she got to the front door, she turned around, "pulled the gun, . . . aimed toward the air, and . . . shot in the air to scare them away for they could stop." (Tr. Vol. 4 at 100). Aldridge further testified that she had been "scared" when she shot the gun and that she "wasn't trying to . . . hurt anybody." (Tr. Vol. 4 at 125). During cross-examination, Aldridge testified that she did not remember shooting her gun the second and third time. When asked if she had shot the gun to save another person's life, she responded that she had not. Aldridge repeated that she had shot her gun in the air to "scare" people and to get them "to stop" fighting. (Tr. Vol. 4 at 128).

[15] Aldridge and the State both tendered an instruction on the lesser-included offense of reckless homicide. The State also tendered an instruction on the lesser-included offense of voluntary manslaughter. Additionally, Aldridge tendered an instruction on self-defense. When the parties were arguing about these tendered instructions, Aldridge's counsel argued against the voluntary manslaughter instruction, pointing out that Aldridge's testimony that she had shot in the air to scare the people showed that her action was "either self-defense . . . or, at the worst, reckless homicide." (Tr. Vol. 4 at 178). The trial court instructed the jury as to the two lesser-included offenses and to self-defense.

[16] During closing arguments, the State discussed with the jury the three verdict options, which included murder, voluntary manslaughter, and reckless homicide. When discussing reckless homicide, the State argued that if the jury believed that Aldridge had fired her gun multiple times to get the people to stop

fighting and to scare them away and thus determined that Aldridge had committed reckless homicide, then her claim of self-defense would not be applicable. Specifically, the State argued that reckless homicide involved an *unjustifiable* disregard for the harm that might result, whereas self-defense involved a person being *justified* in using deadly force in order to prevent serious bodily injury to herself or another. The State asserted that Aldridge "c[ould]n't use deadly force to try to encourage people to behave differently." (Tr. Vol. 4 at 206). The State argued that "there's no self-defense for reckless homicide, the use of deadly force is either justified and necessary or it isn't." (Tr. Vol. 4 at 207). The State then argued that, nevertheless, Aldridge's claim of self-defense was inapplicable because she had initiated the fight and was a willing participant and had used excessive force under the circumstances.

[17] During Aldridge's closing argument, her counsel argued that a State's witness had testified that Aldridge had "point[ed] the gun up on the first shot" and had "aimed up on that first shot." (Tr. Vol. 4 at 216, 221). Counsel then argued that the jury had "one of two things" that included either "not guilty by reason of self-defense or . . . [guilty of] reckless homicide[.]" (Tr. Vol. 4 at 221-22). Aldridge's counsel concluded his closing argument by "asking [the jury] to return a verdict of not guilty" based on self-defense or "to return a verdict of reckless homicide" if the jurors were unable to find Aldridge not guilty. (Tr. Vol. 4 at 222).

[18] The jury found Aldridge guilty of reckless homicide. The trial court imposed a five (5) year sentence, with two (2) years executed in the Indiana Department of

Correction and three (3) years to be served in a community corrections work release program. Aldridge now appeals.

# Decision

On appeal, Aldridge argues that the State failed to present sufficient evidence to support her reckless homicide conviction.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (internal quotation marks and citations omitted) (emphasis in original). Additionally, our Indiana Supreme Court has explained that "when determining whether the elements of an offense are proven beyond a reasonable doubt, a fact-finder may consider both the evidence *and the resulting reasonable inferences*." *Thang v. State*, 10 N.E.3d 1256, 1260 (Ind. 2014) (emphasis in original).

[20] The reckless homicide statute, INDIANA CODE § 35-42-1-5, provides that "[a] person who recklessly kills another human being commits reckless homicide, a Level 5 felony." "A person engages in conduct 'recklessly' if [s]he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." I.C. § 35-41-2-2(c).

[21] Aldridge does not dispute the fact that she shot and killed Pryor. Instead, her challenge to the sufficiency of the evidence is limited to her assertion that, in order to convict Aldridge of reckless homicide, the State was required to prove both that she recklessly killed Pryor *and* that she did not act in self-defense.

[22] At trial, however, Aldridge did not argue that she had committed the lesser-included reckless homicide offense in self-defense. Instead, Aldridge raised self-defense and reckless homicide as two different defense theories to the charge of murder. Indeed, in closing arguments, Aldridge argued that the jury had an *either/or* choice between self-defense and reckless homicide. Specifically, Aldridge's counsel told the jury that it should either: (1) find Aldridge not guilty based on self-defense; or (2) find Aldridge guilty of reckless homicide. The jury chose the latter. Because Aldridge did not raise the issue of self-defense in relation to reckless homicide, we will not review her challenge to self-defense on appeal. *See Gary v. State*, 124 N.E.3d 90, 95 (Ind. Ct. App. 2019) (holding that, under the invited error doctrine, the defendant had waived any appellate challenge to the sufficiency of the evidence supporting his conviction where he had asked the jury to return a verdict on the charge).

[23]     The State presented sufficient evidence to support Aldridge's reckless homicide conviction. Aldridge and many others engaged in a major brawl in the front yard of the Woodland house. Aldridge pulled away from the fight, went up to the front door area, took out her gun from her jacket, and shot it three times, with one of the bullets striking Pryor's forehead and killing him. There was evidence that Aldridge shot the gun up in the air and that additional rounds were fired in an effort to stop the fighting. Aldridge's conduct was in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involved a substantial deviation from acceptable standards of conduct.

[24]     Aldridge's challenge to the evidence supporting her reckless homicide conviction is nothing more than an invitation to reweigh the evidence and judge the credibility of the witnesses, which we will not do. *See Drane*, 867 N.E.2d at 146. Because there was probative evidence from which the jury could have found that Aldridge had recklessly killed Pryor, we affirm her conviction for Level 5 felony reckless homicide. *See Rice v. State*, 916 N.E.2d 962, 968-69 (Ind. Ct. App. 2009) (holding that the evidence that the defendant had pointed his gun upward and shot into a car with six occupants was sufficient to support the defendant's reckless homicide conviction). *See also Young v. State*, 699 N.E.2d 252, 257 (Ind. 1998) (explaining that a defendant firing a handgun at a group of people twenty feet away constituted reckless behavior such that a reckless homicide instruction should have been given), *reh'g denied*.

Affirmed.

Kirsch, J., and Tavitas, J., concur.